UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

| | |
|---|---|
| SABLE NETWORKS, INC. AND SABLE IP, LLC, | C.A. No._____ |
| *Plaintiffs,* | JURY TRIAL DEMANDED |
| v. | |
| CHECK POINT SOFTWARE TECHNOLOGIES LTD. AND CHECK POINT SOFTWARE TECHNOLOGIES, INC., | |
| *Defendants.* | |

## COMPLAINT FOR PATENT INFRINGEMENT

Sable Networks, Inc. and Sable IP, LLC (collectively, "Sable" or "Plaintiffs") bring this action and make the following allegations of patent infringement relating to U.S. Patent Nos.: 6,954,431 (the "'431 patent"); 6,977,932 (the "'932 patent"); 8,085,775 (the "'775 patent"); 8,243,593 (the "'593 patent"); 8,817,790 (the "'790 patent"); and 9,774,501 (the "'501 patent") (collectively, the "patents-in-suit").  Defendants Check Point Software Technologies Ltd. and Check Point Software Technologies, Inc. (collectively, "Check Point" or "Defendants") infringe the patents-in-suit in violation of the patent laws of the United States of America, 35 U.S.C. § 1 *et seq*.

## INTRODUCTION

1.     The patents-in-suit arise from technologies developed by Dr. Lawrence G. Roberts - one of the founding fathers of the internet.[1]  The patents relate to technologies for efficiently managing the flow of data packets over routers, firewalls, and switch devices.  Dr. Roberts and

---

[1] Chris Woodford, THE INTERNET: A HISTORICAL ENCYCLOPEDIA VOLUME 2 at 204 (2005) ("Widely regarded as one of the founding fathers of the Internet, Lawrence Roberts was the primary architect of ARPANET, the predecessor of the Internet.").

engineers at Caspian Networks, Inc. and later Sable Networks, Inc. developed these technologies

to address the increasing amount of data sent over computer networks.

    2.      Dr. Roberts is best known for his work as the Chief Scientist of the Advanced

Research Projects Agency (ARPA) where he designed and oversaw the implementation of

ARPANET, the precursor to the internet.   Dr. Roberts' work on ARPANET played a key role in

the development of digital network transmission technologies.[2]   Initially, ARPANET was used

primarily to send electronic mail and Dr. Roberts developed the first program for reading and

sending electronic messages.



Keenan Mayo and Peter Newcomb, *How The Web Was Won*, VANITY FAIR at 96-97 (January 7, 2009); *One of the Engineers Who Invented the Internet Wants to Build A Radical new Router*, IEEE SPECTRUM MAGAZINE (July 2009); Katie Hafner, *Billions Served Daily, and Counting*, N.Y. TIMES at G1 (December 6, 2001)("Lawrence Roberts, who was then a manager at the Advanced Research Projects Agency's Information Processing Techniques Office, solved that problem after his boss began complaining about the volume of e-mail piling up in his in box. In 1972, Dr. Roberts produced the first e-mail manager, called RD, which included a filing system, as well as a Delete function.").

    3.      Dr. Roberts' work on ARPANET played a key role in the development of packet

switching networks.  Packet switching is a digital network transmission process in which data is

broken into parts which are sent independently and reassembled at a destination.   Electronic

---

[2] Katie Hafner, *Lawrence Roberts, Who Helped Design Internet's Precursor,* N.Y. TIMES at A2 (December 31, 2018) ("Dr. Roberts was considered the decisive force behind packet switching, the technology that breaks data into discrete bundles that are then sent along various paths around a network and reassembled at their destination.").

messages sent over the ARPANET were broken up into packets then routed over a network to a destination.  "In designing the ARPANET, Roberts expanded on the work he'd done at MIT, using those tiny data packets to send information from place to place."[3]  Packet switching has become the primary technology for data communications over computer networks.



George Johnson, *From Two Small Nodes, a Mighty Web Has Grown*, N.Y. TIMES at F1 (October 12, 1999).

4.      After leaving ARPANET, Dr. Roberts grew increasingly concerned that existing technologies for routing data packets were incapable of addressing the increasing amounts of data traversing the internet.[4]  Dr. Roberts identified that as the "Net grows, the more loss and transmission of data occurs.   Eventually, gridlock will set in."[5]

> ***The Internet is broken. I should know: I designed it***. In 1967, I wrote the first plan for the ancestor of today's Internet, the Advanced Research Projects Agency Network, or ARPANET, and then led the team that designed and built it. The main idea was to share the available network infrastructure by sending data as small, independent packets, which, though they might arrive at different times, would still generally make it to their destinations. The small computers that directed the data

[3] Code Metz, *Larry Roberts Calls Himself the Founder of The Internet.  Who Are You To Argue*, WIRED MAGAZINE (September 24, 2012); John C. McDonald, FUNDAMENTALS OF DIGITAL SWITCHING at 211 (1990) ("The ARPANET was, in part, an experimental verification of the packet switching concept.  Robert's objective was a new capability for resource sharing.").

[4] eWeek Editors, *Feeling A Little Congested,* EWEEK MAGAZINE (September 24, 2001) ("Lawrence Roberts, one of the primary developers of Internet precursor ARPANet and CTO of Caspian Networks, recently released research indicating that Net traffic has quadrupled during the past year alone.").

[5] Michael Cooney, *Can ATM Save The Internet,* NETWORK WORLD at 16 (May 20, 1996); Lawrence Roberts, A RADICAL NEW ROUTER, IEEE Spectrum Vol. 46 34-39 (August 2009).

traffic-I called them Interface Message Processors, or IMPs-evolved into today's routers, and for a long time they've kept up with the Net's phenomenal growth. Until now.

Lawrence Roberts, *A Radical New Router*, IEEE SPECTRUM Vol. 46(7) at 34 (August 2009) (emphasis added).

5.     In 1998, Dr. Roberts founded Caspian Networks.[6]   At Caspian Networks, Dr. Roberts developed a new kind of internet router to efficiently route packets over a network.  This new router was aimed at addressing concerns about network "gridlock."  In a 2001 interview with Wired Magazine, Dr. Roberts discussed the router he was developing at Caspian Networks – the Apeiro.   "Roberts says the Apeiro will also create new revenue streams for the carriers by solving the 'voice and video problem.'  IP voice and video, unlike email and static Web pages, breaks down dramatically if there's a delay - as little as a few milliseconds - in getting packets from host to recipient."[7]



Jim Duffy, *Router Newcomers take on Cisco, Juniper*, NETWORK WORLD at 14 (April 14, 2013); Stephen Lawson, *Caspian Testing Stellar Core Offering*, NETWORK WORLD at 33 (December 17, 2001); Tim Greene, *Caspian Plans Superfast Routing for The 'Net Core*, NETWORK WORLD at 10 (January 29, 2001); Andrew P. Madden, *Company Spotlight: Caspian Networks*, MIT TECHNOLOGY REVIEW at 33 (August 2005); and Loring Wirbel, *Caspian Moves Apeiro Router To Full Availability*, EE TIMES (April 14, 2003).

---

[6] Caspian Networks, Inc. was founded in 1998 as Packetcom, LLC and changed its name to Caspian Networks, Inc. in 1999.

[7] John McHugh, *The n-Dimensional Superswitch*, WIRED MAGAZINE (May 1, 2001).

6.     The Apeiro debuted in 2003.  The Apeiro, a flow-based router, can identify the nature of a packet – be it audio, text, or video, and prioritize it accordingly.  The Apeiro included numerous technological advances including quality of service (QoS) routing and flow-based routing.

7.     At its height, Caspian Networks Inc. raised more than $300 million dollars and grew to more than 320 employees in the pursuit of developing and commercializing Dr. Roberts' groundbreaking networking technologies, including building flow-based routers that advanced quality of service and load balancing performance.  However, despite early success with its technology and business, Caspian hit hard times when the telecommunications bubble burst.

8.     Sable Networks, Inc. was formed by Dr. Sang Hwa Lee to further develop and commercialize the flow-based networking technologies developed by Dr. Roberts and Caspian Networks.[8]  Sable Networks, Inc. has continued its product development efforts and has gained commercial success with customers in Japan, South Korea, and China.  Customers of Sable Networks, Inc. have included: SK Telecom, NTT Bizlink, Hanaro Telecom, Dacom Corporation, USEN Corporation, Korea Telecom, China Unicom, China Telecom, and China Tietong.

---

[8] Dr. Lee, through his company Mobile Convergence, Ltd. purchased the assets of Caspian Networks Inc. and subsequently created Sable Networks, Inc.



*SK Telecom and Sable Networks Sign Convergence Network Deal*, COMMS UPDATE – TELECOM NEWS SERVICE (February 4, 2009) ("South Korean operator SK Telecom has announced that it has signed a deal with US-based network and solutions provider Sable Networks."); *China Telecom Deploys Sable*, LIGHT READING NEWS FEED (November 19, 2007) ("Sable Networks Inc., a leading provider of service controllers, today announced that China Telecom Ltd, the largest landline telecom company in China, has deployed the Sable Networks Service Controller in their network.").

9.      Armed with the assets of Caspian Networks Inc., as well as members of Caspian Networks' technical team, Sable Networks, Inc. continued the product development efforts stemming from Dr. Roberts' flow-based router technologies.  Sable Networks, Inc. developed custom application-specific integrated circuits ("ASIC") designed for flow traffic management. Sable Network, Inc.'s ASICs include the Sable Networks SPI, which enables 20 Gigabit flow processing.  In addition, Sable Networks, Inc. developed and released S-Series Service Controllers (*e.g.*, S80 and S240 Service Controller models) that contain Sable Networks' flow-based programmable ASICs, POS and Ethernet interfaces, and carrier-hardened routing and scalability from 10 to 800 Gigabits.



SABLE NETWORKS S-SERIES SERVICE CONTROLLERS (showing the S240-240G Multi-Shelf System, S80-80G Single-Shelf System, and S20-20G Stand-Alone System).

10. Sable pursues the reasonable royalties owed for Check Point's use of the inventions claimed in Sable's patent portfolio, which arise from Caspian Networks and Sable Networks' groundbreaking technology.

### SABLE'S PATENT PORTFOLIO

11. Sable's patent portfolio includes over 34 patent assets, including 14 granted U.S. patents. Dr. Lawrence Roberts' pioneering work on QoS traffic prioritization, flow-based switching and routing, and the work of Dr. Roberts' colleagues at Caspian Networks Inc. and Sable Networks, Inc. are claimed in the various patents owned by Sable.

12. Highlighting the importance of the patents-in-suit is the fact that the Sable's patent portfolio has been cited by over 1,000 U.S. and international patents and patent applications assigned to a wide variety of the largest companies operating in the computer networking field. Sable's patents have been cited by companies such as:

- Cisco Systems, Inc.[9]
- Juniper Networks, Inc.[10]
- Broadcom Limited[11]
- EMC Corporation[12]
- F5 Networks, Inc.[13]
- Verizon Communications Inc.[14]
- Microsoft Corporation[15]
- Intel Corporation[16]
- Extreme Networks, Inc.[17]
- Huawei Technologies Co., Ltd.[18]

## THE PARTIES

### SABLE NETWORKS, INC.

13.    Sable Networks, Inc. ("Sable Networks") is a corporation organized and existing under the laws of the State of California.

14.    Sable Networks was formed to continue the research, development, and commercialization work of Caspian Networks Inc., which was founded by Dr. Lawrence Roberts to provide flow-based switching and routing technologies to improve the efficiency and quality of computer networks.  Sable Networks is the owner by assignment of all of the patents-in-suit.

---

[9] *See, e.g.*, U.S. Patent Nos. 7,411,965; 7,436,830; 7,539,499; 7,580,351; 7,702,765; 7,817546; 7,936,695; 8,077,721; 8,493,867; 8,868,775; and 9,013,985.

[10] *See, e.g.*, U.S. Patent Nos. 7,463,639; 7,702,810; 7,826,375; 8,593,970; 8,717,889; 8,811,163; 8,811,183; 8,964,556; 9,032,089; 9,065,773; and 9,832,099.

[11] *See, e.g.*, U.S. Patent No. 7,187,687; 7,206,283; 7,266,117; 7,596,139; 7,649,885; 8,014,315; 8,037,399; 8,170,044; 8,194,666; 8,271,859; 8,448,162; 8,493,988; 8,514,716; and 7,657,703.

[12]  *See, e.g.*, U.S. Patent Nos. 6,976,134; 7,185,062; 7,404,000; 7,421,509; 7,864,758; and 8,085,794.

[13] *See, e.g.*, U.S. Patent Nos. 7,206,282; 7,580,353; 8,418,233; 8,565,088; 9,225,479; 9,106,606; 9,130,846; 9,210,177; 9,614,772; 9,967,331; and 9,832,069.

[14]  *See, e.g.*, U.S. Patent Nos. 7,349,393; 7,821,929; 8,218,569; 8,289,973; 9,282,113; and 8,913,623.

[15] *See, e.g.*, U.S. Patent Nos. 7,567,504; 7,590,736; 7,669,235; 7,778,422; 7,941,309; 7,636,917; 9,571,550; and 9,800,592.

[16] *See, e.g.*, U.S. Patent Nos. 7,177,956; 7,283,464; 9,485,178; 9,047,417; 8,718,096; 8,036,246; 8,493,852; and 8,730,984.

[17]  *See, e.g.*, U.S. Patent Nos. 7,903,654; 7,978,614; 8,149839; 10,212,224; 9,112,780; and 8,395,996.

[18] *See, e.g.*, U.S. Patent Nos. 7,903,553; 7,957,421; 10,015,079; 10,505,840; and Chinese Patent Nos. CN108028828 and CN106161333.

### SABLE IP, LLC

15.     Sable IP, LLC ("Sable IP") is a Delaware limited liability company with its principal place of business at 225 S. 6th Street, Suite 3900, Minneapolis, Minnesota 55402. Pursuant to an exclusive license agreement with Sable Networks, Sable IP is the exclusive licensee of the patents-in-suit.

### THE CHECK POINT DEFENDANTS

16.     Check Point Software Technologies Ltd. is a limited company organized and existing under the laws of Israel with its principal place of business at 5 Shlomo Kaplan Street, Tel Aviv 6789159, Israel.  Check Point Software Technologies Ltd. may be served via its United States subsidiary, Check Point Software Technologies, Inc., care of Check Point Software Technologies, Inc.'s registered agent for service of process, Corporation Service Company d/b/a CSC – Lawyers Incorporating Service, 2710 Gateway Oaks Drive, Suite 150N, Sacramento, CA 95833.

17.     Check Point Software Technologies, Inc. is a Delaware corporation with offices at 500 5th Ave #52, New York, New York 10110 and 959 Skyway Road, Suite 300, San Carlos, California 94070.  Check Point Software Technologies, Inc. may be served via its registered agent for service of process, Corporation Service Company, 251 Little Falls Drive, Wilmington, Delaware 19808.

### JURISDICTION AND VENUE

18.     This action arises under the patent laws of the United States, Title 35 of the United States Code.  Accordingly, this Court has exclusive subject matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1338(a).

19.     This Court has personal jurisdiction over Check Point in this action because Check Point has committed acts within the State of Delaware giving rise to this action and has established

minimum contacts with this forum such that the exercise of jurisdiction over Check Point would not offend traditional notions of fair play and substantial justice.  Defendants directly and/or through subsidiaries or intermediaries (including distributors, retailers, and others), have committed and continue to commit acts of infringement in this District by, among other things, offering to sell and selling products and/or services that infringe the patents-in-suit.  Moreover, Check Point Software Technologies, Inc. is a corporation organized and existing under the laws of the State of Delaware.

20.     Venue is proper in this district under 28 U.S.C. §§ 1391(b)-(d) and 1400(b). Defendant Check Point Software Technologies, Inc. is a corporation organized and existing under the laws of the State of Delaware, and therefore resides in the District of Delaware as defined by 28 U.S.C. § 1400(b).  Venue in this District is proper as to Defendant Check Point Software Technologies Ltd. because Check Point Software Technologies Ltd. is a foreign corporate entity; venue is therefore proper in any judicial District, including the District of Delaware, where personal jurisdiction is proper.

### THE ASSERTED PATENTS

#### U.S. PATENT NO. 6,954,431

21.     U.S. Patent No. 6,954,431 (the "'431 patent") entitled, *Micro-Flow Management*, was filed on December 6, 2001, and claims priority to April 19, 2000.  The '431 patent is subject to a 35 U.S.C. § 154(b) term extension of 722 days.  Sable Networks, Inc. is the owner by assignment of the '431 patent.  Sable IP is the exclusive licensee of the '431 patent.  A true and correct copy of the '431 patent is attached hereto as Exhibit A.

22.     The '431 patent discloses novel methods and systems for managing data traffic comprising a plurality of micro-flows through a network.

23.     The inventions disclosed in the '431 patent improve the quality of service in data transmissions over a computer network by relying on per micro-flow state information that enables rate and delay variation requirements to be within set quantified levels of service.

24.     The '431 patent discloses technologies that speed the rate at which data can effectively travel over a computer network by optimizing packet discarding.

25.     The '431 patent discloses the use of micro-flow state information to determine the rate of each flow, thus optimizing discards and optimizing the quality of service of data transmission.

26.     The '431 patent discloses methods and systems that avoid networking system degradation by not overloading network switch buffers.

27.     The '431 patent discloses a method for managing data traffic through a network that determines a capacity of a buffer containing a micro-flow based on a characteristic.

28.     The '431 patent discloses a method for managing data traffic through a network that assigns an acceptable threshold value for the capacity of the buffer over a predetermined period of time.

29.     The '431 patent discloses a method for managing data traffic through a network that delegates a portion of available bandwidth in the network to the micro-flow.

30.     The '431 patent discloses a method for managing data traffic through a network that uses the buffer for damping jitter associated with the micro-flow.

31.     The '431 patent has been cited by 103 patents and patent applications as relevant prior art.  Specifically, patents issued to the following companies have cited the '431 patent as relevant prior art:

- Cisco Systems, Inc.
- Juniper Networks, Inc.

- Broadcom Limited
- Intel Corporation
- Sun Microsystems, Inc.
- Oracle Corporation
- Samsung Electronics Co., Ltd.
- Adtran, Inc.
- Time Warner Cable, Inc.
- FSA Technologies, Inc.
- Internap Corporation
- France Telecom
- The Boeing Company
- Wistaria Trading, Ltd.

**U.S. PATENT NO. 6,977,932**

32.     U.S. Patent No. 6,977,932 (the "'932 patent") entitled, *System and Method for Network Tunneling Utilizing Micro-Flow State Information*, was filed on January 16, 2002. The '932 patent is subject to a 35 U.S.C. § 154(b) term extension of 815 days. Sable Networks, Inc. is the owner by assignment of the '932 patent. Sable IP, LLC is the exclusive licensee of the '932 patent. A true and correct copy of the '932 patent is attached hereto as Exhibit B.

33.     The '932 patent discloses novel methods and apparatuses for utilizing a router capable of network tunneling utilizing flow state information.

34.     The inventions disclosed in the '932 patent enable the use of micro-flow state information to improve network tunneling techniques.

35.     The inventions disclosed in the '932 patent maintain flow state information for various quality of service characteristics by utilizing aggregate flow blocks.

36.     The aggregate flow blocks disclosed in the '932 patent maintain micro-flow block information.

37.     The technologies claimed in the '932 patent speed the flow of network traffic over computer networks by avoiding time consuming and processor intensive tasks by combining flow state information with other information such as label switched paths utilization information. This

permits the micro-flows associated with an aggregate flow block to all be processed in a similar manner.

38.     The technologies disclosed in the '932 patent result in more efficient computer networks by avoiding the processor intensive tasks of searching millions of flow blocks to identify flow blocks having certain micro-flow characteristics in order to process large numbers of micro-flows.

39.     The '932 patent discloses a router capable of network tunneling utilizing flow state information containing an aggregate flow block having tunnel specific information for a particular network tunnel.

40.     The '932 patent discloses a router capable of network tunneling utilizing flow state information containing a flow block having flow state information for a micro-flow, the flow block further including an identifier that associates the flow block with the aggregate flow block.

41.     The '932 patent discloses a router capable of network tunneling utilizing flow state information wherein the aggregate flow block stores statistics for the particular network tunnel.

42.     The '932 patent has been cited by 86 patents and patent applications as relevant prior art.  Specifically, patents issued to the following companies have cited the '932 patent as relevant prior art:

- Cisco Systems, Inc.
- Juniper Networks, Inc.
- Avaya, Inc.
- Fujitsu, Ltd.
- Intel Corporation
- Nokia Corporation
- Qualcomm, Inc.
- Sprint Communications Co.
- Telefonaktiebolaget LM Ericsson
- Verizon Communications, Inc.

**U.S. PATENT NO. 8,085,775**

43.     U.S. Patent No. 8,085,775 (the "'775 patent") entitled, *Identifying Flows Based On Behavior Characteristics And Applying User-Defined Actions*, was filed on July 31, 2006.  The '775 patent is subject to a 35 U.S.C. § 154(b) term extension of 467 days.  Sable Networks, Inc. is the owner by assignment of the '775 patent.  Sable IP is the exclusive licensee of the '775 patent. A true and correct copy of the '775 patent is attached hereto as Exhibit C.

44.     The '775 patent discloses novel methods for identifying and handling a single application flow of a plurality of information packets.

45.     The inventions disclosed in the '775 patent teach methods of identifying, classifying, and controlling information packet flows based on their observed behavior rather than the content of the data packets.

46.     The '775 patent teaches technologies that can effectively identify and control specific types of data traffic despite attempts to conceal the content or type of traffic represented by the data packets.

47.     The '775 patent discloses a machine-implemented method for the identification and handling of a single application flow that creates a flow block as the first packet of a flow is processed by a router.

48.     The '775 patent discloses a machine-implemented method for the identification and handling of a single application flow that utilizes a flow block adapted to store payload-content agnostic behavioral statistics about the flow.

49.     The '775 patent discloses a machine-implemented method for the identification and handling of a single application flow that updates the flow block with the flow's payload-content agnostic behavioral statistics as packets belonging to the flow are processed by the router.

50.     The '775 patent discloses a machine-implemented method for the identification and handling of a single application flow that utilizes a flow incapable of being identified by header information alone.

51.     The '775 patent discloses a machine-implemented method for the identification and handling of a single application flow that heuristically determines whether at least one user-specified policy is satisfied by the payload-content agnostic behavioral statistics stored in the flow block.

52.     The '775 patent discloses a machine-implemented method for the identification and handling of a single application flow that includes functionality wherein the payload-content agnostic behavioral statistics for the flow are calculated by the router.

53.     The '775 patent discloses a machine-implemented method for the identification and handling of a single application flow that includes functionality wherein the payload-content agnostic behavioral statistics reflect the empirical behavior of the flow.

54.     The '775 patent discloses a machine-implemented method for the identification and handling of a single application flow that includes functionality wherein at least one of the payload-content agnostic behavioral statistics is one of the following characteristics: (1) total byte count accumulated for the flow, (2) flow life duration, (3) average rate of flow, (4) average packet size, (5) average packet rate, (6) average inter-packet gap, (7) instantaneous flow rate, and (8) moving average flow rate.

55.     The '775 patent has been cited by 36 patents and patent applications as relevant prior art.  Specifically, patents issued to the following companies have all cited the '775 patent as relevant prior art:

- Cisco Systems, Inc.
- Calix, Inc.

- British Telecommunications Public Limited Company
- Extreme Networks, Inc.
- Fujitsu Ltd.
- Level 3 Communications, Inc.
- Nokia Corporation
- Sprint Spectrum L.P.
- Solana Networks Inc.
- Taiwan Semiconductor Mfg. Co. Ltd.
- Verizon Communications, Inc.

## U.S. PATENT NO. 8,243,593

56.    U.S. Patent No. 8,243,593 entitled, *Mechanism for Identifying and Penalizing Misbehaving Flows in a Network*, was filed on December 22, 2004.  The '593 patent is subject to a 35 U.S.C. § 154(b) term extension of 1,098 days.  Sable Networks, Inc. is the owner by assignment of the '593 patent.  Sable IP is the exclusive licensee of the '593 patent.   A true and correct copy of the '593 patent is attached hereto as Exhibit D.

57.    The '593 patent discloses novel methods and systems for processing a flow of a series of information packets.

58.    The inventions disclosed in the '593 patent teach technologies that permit the identification and control of less desirable network traffic.

59.    Because the characteristics of data packets in undesirable network traffic can be disguised, the '593 patent improves the operation of computer networks by disclosing technologies that monitor the characteristics of flows of data packets rather than ancillary factors such as port numbers or signatures.

60.    The '593 patent discloses tracking the behavioral statistics of a flow of data packets that can be used to determine whether the flow is undesirable.

61.    The '593 patent further discloses taking actions to penalize the flow of undesirable network traffic.

62. The '593 patent discloses a method for processing a flow of a series of information packets that maintains a set of behavioral statistics for the flow, wherein the set of behavioral statistics is updated based on each information packet belonging to the flow, as each information packet is processed.

63. The '593 patent discloses a method for processing a flow of a series of information packets that determines, based at least partially upon the set of behavioral statistics, whether the flow is exhibiting undesirable behavior.

64. The '593 patent discloses that the determination as to whether the flow is exhibiting undesirable behavior is made regardless of the presence or absence of congestion.

65. The '593 patent discloses a method for processing a flow of data packets that enforces a penalty on the flow in response to a determination that the flow is exhibiting undesirable behavior.

66. The '593 patent has been cited by 17 patents and patent applications as relevant prior art.  Specifically, patents issued to the following companies have cited the '593 patent as relevant prior art.

- Cisco Systems, Inc.
- AT&T, Inc.
- International Business Machines Corporation
- Telecom Italia S.p.A.
- McAfee, LLC

**U.S. PATENT NO. 8,817,790**

67. U.S. Patent No. 8,817,790 (the "'790 patent") entitled, *Identifying Flows Based on Behavior Characteristics and Applying User-Defined Actions*, was filed on September 23, 2011, and claims priority to July 31, 2006.  Sable Networks, Inc. is the owner by assignment of the '790

patent.  Sable IP is the exclusive licensee of the '790 patent.   A true and correct copy of the '790 patent is attached hereto as Exhibit E.

68.    The '790 patent claims specific methods and devices for handling a flow of information packets.

69.    The '790 patent discloses methods and systems for efficiently identifying undesirable traffic over data networks.

70.    The '790 patent teaches technologies that identify traffic not by inspecting the payload of each data packet, but rather by analyzing and classifying the behavior of the data flows to identify undesirable traffic.

71.    The '790 patent discloses applying a user-specified action associated with a policy applicable to data flows that are designated undesirable.

72.    The '790 patent discloses a method of handling a flow that processes a flow comprised of two or more information packets having header information in common.

73.    The '790 patent discloses a method of handling a flow that stores header-independent statistics about the flow in a flow block associated with the flow.

74.    The '790 patent discloses a method of handling a flow that updates the header-independent statistics in the flow block as each information packet belonging to the flow is processed.

75.    The '790 patent discloses a method of handling a flow that categorizes the flow as one or more traffic types by determining whether the header-independent statistics match one or more profiles corresponding to a traffic type.

76.    The '790 patent discloses a method of handling a flow that performs an operation that is determined according to the one or more traffic types on one or more information packets

belonging to the flow if the one or more traffic types match one or more particular traffic types designated by a user.

77.     The '790 patent family has been cited by 24 United States and international patents and patent applications as relevant prior art.   Specifically, patents issued to the following companies have cited the '790 patent family as relevant prior art:

- Cisco Systems, Inc.
- Solana Networks, Inc.
- British Telecommunications Public Limited Company
- Level 3 Communications, LLC
- Calix, Inc.
- Nokia Corporation
- Verizon Communications, Inc.
- Sprint Spectrum L.P.
- Hon Hai Precision Industry Co., Ltd.

## U.S. PATENT NO. 9,774,501

78.     U.S. Patent No. 9,774,501 (the "'501 patent") entitled, *System and Method for Ensuring Subscriber Fairness Using Outlier Detection*, was filed on September 7, 2016, and claims priority to May 14, 2012.  Sable Networks, Inc. is the owner by assignment of the '501 patent.   Sable IP is the exclusive licensee of the '501 patent.   A true and correct copy of the '501 patent is attached hereto as Exhibit F.

79.     The '501 patent claims specific methods and devices for a subscriber fairness solution that uses flow-based statistical collection mechanism to monitor subscriber usage across various attributes.

80.     The '501 patent discloses methods and systems for detecting outlier users of a network resource.

81.    The '501 patent teaches technologies for detecting outlier users of a network resource using a fairness model that accounts for the cost of a user's behavior on other users and provides for evaluating and effecting service fairness.

82.    The '501 patent discloses aggregating flow data of a user of a network resource for set time periods.  The flow data that is aggregated can include connections between a particular source IP address and transport layer port to a particular destination IP address and transport layer port.

83.    The '501 patent discloses applying outlier detection logic to the flow-count pattern that is generated for a user and comparing it to flow-count patterns associated with other users on the network.

84.    The '501 patent discloses a method of assigning a flow-count band to the user based on the outlier detection logic where the user's flow count is compared to the flow-count data of other users on the network.

85.    The '501 patent discloses a method of applying a mitigating action to the user based on the user's access to the network resource based on the flow-count band that the user's activity causes the user to be assigned to.

86.    The '510 patent discloses a method of implementing outlier detection for a user on a network using a detection phase and a mitigation phase. In the detection phase, "outliers" are identified - users that are using a disproportionate amount of network resources.  In the mitigation phase, actions are taken to restrict the access of the outlier user to network resources.

87.    The '501 patent discloses a computer implemented method that improves the function of a computer network through using outlier detection to mitigate an individual user's overuse of the network bandwidth.

88.     The '501 patent family has been cited by 11 United States and international patents and patent applications as relevant prior art.  Specifically, patents issued to the following companies have cited the '501 patent family as relevant prior art:

- Cisco Systems, Inc.
- International Business Machines Corporation
- Google, Inc.
- Adobe, Inc.
- British Telecomm
- VMware, Inc.
- Sprint Spectrum L.P.
- Infinera Corporation

## COUNT I
## INFRINGEMENT OF U.S. PATENT NO. 6,954,431

89.     Plaintiffs reference and incorporate by reference the preceding paragraphs of this Complaint as if fully set forth herein.

90.     Check Point designs, makes, uses, sells, and/or offers for sale in the United States products and/or services for managing data traffic comprising a plurality of micro-flows through a network.

91.     Check Point designs, makes, sells, offers to sell, imports, and/or uses the following products: Check Point Smart-1 Security Appliances with the Gaia OS R80.10 and later (including models: 25b, 50, 150, 205, 210, 225, 405, 410, 525, 625, 3050, 3150, 5050, 5150, 6000-L, and 6000-XL) and Check Point Security Appliances with the Gaia OS R80.10 and later (including models: 2200, 3000, 4000, 5000, 5900, 6500, 6800, 6200B, 6200P, 6200T, 6600, 6400, 6700, 6900, 7000, 12000, 13000, 15000, 16000, 16000T, 16200, 16600HS, 21000, 23000, 26000, 26000T, 28000, and 28600 HS) (collectively, the "Check Point '431 Products(s)").

92.     One or more Check Point subsidiaries and/or affiliates use the Check Point '431 Products in regular business operations.

93.     One or more of the Check Point '431 Products include technology for managing data traffic comprising a plurality of micro-flows through a network.

94.     One or more of the Check Point '431 Products determine the capacity of a buffer containing a micro-flow based on a characteristic.

95.     One or more of the Check Point '431 Products assign an acceptable threshold value for the capacity of the buffer over a predetermined period of time.

96.     One or more of the Check Point '431 Products delegate a portion of available bandwidth in the network to the micro-flow.

97.     The Check Point '431 Products enable the setting of thresholds for a buffer that include the ability to set a threshold as a percentage of the buffer.

98.     One or more of the Check Point '431 Products use the buffer for damping jitter associated with the micro-flow.

99.     The Check Point '431 Products use buffers to limit jitter which is delay variance.

100.    Check Point has directly infringed and continues to directly infringe the '431 patent by, among other things, making, using, offering for sale, and/or selling technology for managing data traffic comprising a plurality of micro-flows through a network, including but not limited to the Check Point '431 Products.

101.    The Check Point '431 Products are available to businesses and individuals throughout the United States.

102.    The Check Point '431 Products are provided to businesses and individuals located in the State of Delaware.

103.    By making, using, testing, offering for sale, and/or selling products and services for managing data traffic comprising a plurality of micro-flows through a network, including but not

limited to the Check Point '431 Products, Check Point has injured Plaintiffs and is liable to Plaintiffs for directly infringing one or more claims of the '431 patent, including at least claim 1 pursuant to 35 U.S.C. § 271(a).

104.    Check Point also indirectly infringes the '431 patent by actively inducing infringement under 35 USC § 271(b).

105.    On information and belief, Check Point has had knowledge of the '431 patent since at least April 13, 2020, or shortly thereafter.

106.    On April 13, 2020, Plaintiffs filed suit against Cisco Systems, Inc. in the United States District Court for the Western District of Texas asserting, among other claims, infringement of the '431 patent.  On June 15, 2020, Plaintiffs filed suit against Juniper Networks, Inc. in the United States District Court for the Western District of Texas asserting, among other claims, infringement of the '431 patent.  On September 1, 2020, Plaintiffs filed suit against Nokia Corporation, Nokia of America Corporation, and Nokia Solutions and Networks Oy (collectively, "Nokia") in the United States District Court for the Western District of Texas asserting, among other claims, infringement of the '431 patent.  On December 10, 2020, Plaintiffs filed suit against Fortinet, Inc. and Masergy Communications, Inc. in the United States District Court for the Eastern District of Texas asserting, among other claims, infringement of the '431 patent.

107.    On information and belief, Cisco Systems, Inc.; Juniper Networks, Inc.; Nokia; and Fortinet, Inc. are competitors of Check Point.  On information and belief, Check Point monitors patent infringement lawsuits involving the assertion of pioneering patents in the field of computer networking against Check Point's competitors, including Plaintiffs' assertion of the '431 patent against Cisco Systems, Inc.; Juniper Networks, Inc.; Nokia; and Fortinet, Inc.  Accordingly, on or shortly after April 13, 2020, on information and belief, Check Point reviewed the '431 patent and

the allegations that Check Point's competitors' products infringed the '431 patent and learned that the Check Point '431 Products also infringed the '431 patent.

108.    Alternatively, Check Point has had knowledge of the '431 patent since at least service of this Complaint or shortly thereafter, and Check Point knew of the '431 patent and knew of its infringement, including by way of this lawsuit.

109.    Check Point intended to induce patent infringement by third-party customers and users of the Check Point '431 Products and had knowledge that the inducing acts would cause infringement or was willfully blind to the possibility that its inducing acts would cause infringement.  Check Point specifically intended and was aware that the normal and customary use of the accused products would infringe the '431 patent.  Check Point performed the acts that constitute induced infringement, and would induce actual infringement, with knowledge of the '431 patent and with the knowledge that the induced acts would constitute infringement.  For example, Check Point provides the Check Point '431 Products that have the capability of operating in a manner that infringe one or more of the claims of the '431 patent, including at least claim 1, and Check Point further provides documentation and training materials that cause customers and end users of the Check Point '431 Products to utilize the products in a manner that directly infringe one or more claims of the '431 patent.[19]  By providing instruction and training to customers and

---

[19] *See, e.g.*, *Quantum 6200 Hyperscale Security Gateway for Maestro,* CHECK POINT DATA SHEET (December 8, 2020); *Michael Gabor, Check Point MINI CPX 2016 Troubleshooting and Best Practice,* CHECK POINT PRESENTATION (2016); *Check Point Quantum Smart-1,* CHECK POINT DATA SHEET (February 9, 2021); *Next Generation Security Gateway R80 Administration Guide,* CHECK POINT DOCUMENTATION (December 21, 2020); *Performance Tuning R80.20 Administration Guide,* CHECK POINT DOCUMENTATION (August 5, 2019); *Quality of Service R80.30 Administration Guide*, CHECK POINT DOCUMENTATION (May 2, 2019); *Quantum 16200 Security Gateway*, CHECK POINT DATA SHEET (December 8, 2020); *Quantum Security Gateway Appliance Comparison Chart,* CHECK POINT DOCUMENTATION (November 6, 2020); *Logging and Monitoring R80 Administration Guide,* CHECK POINT DOCUMENTATION (June 7, 2017); *Quality of Service R80.20 Administration Guide,* CHECK POINT DOCUMENTATION (September 25, 2018); and *Scalable Platforms Performance Tuning R80.20SP Administration Guide,* CHECK POINT DOCUMENTATION (October 28, 2019).

end-users on how to use the Check Point '431 Products in a manner that directly infringes one or more claims of the '431 patent, including at least claim 1, Check Point specifically intended to induce infringement of the '431 patent.  Check Point engaged in such inducement to promote the sales of the Check Point '431 Products, e.g., through Check Point user manuals, product support, marketing materials, and training materials to actively induce the users of the accused products to infringe the '431 patent.  Accordingly, Check Point has induced and continues to induce users of the accused products to use the accused products in their ordinary and customary way to infringe the '431 patent, knowing that such use constitutes infringement of the '431 patent.

110.    The '431 patent is well-known within the industry as demonstrated by multiple citations to the '431 patent in published patents and patent applications assigned to technology companies and academic institutions.  Check Point is utilizing the technology claimed in the '431 patent without paying a reasonable royalty.  Check Point is infringing the '431 patent in a manner best described as willful, wanton, malicious, in bad faith, deliberate, consciously wrongful, flagrant, or characteristic of a pirate.

111.    To the extent applicable, the requirements of 35 U.S.C. § 287(a) have been met with respect to the '431 patent.

112.    As a result of Check Point's infringement of the '431 patent, Plaintiffs have suffered monetary damages, and seek recovery in an amount adequate to compensate for Check Point's infringement, but in no event less than a reasonable royalty for the use made of the invention by Check Point together with interest and costs as fixed by the Court.

## COUNT II
## INFRINGEMENT OF U.S. PATENT NO. 6,977,932

113.    Plaintiffs reference and incorporate by reference the preceding paragraphs of this Complaint as if fully set forth herein.

114.    Check Point designs, makes, sells, offers to sell, imports, and/or uses the following products: Check Point Quantum Spark 1500, 1600, and 1800 Appliance Series (including models: 1530, 1550, 1570, 1590, 1570R, 1600, and 1800) (collectively, the "Check Point '932 Products(s)").

115.    One or more Check Point subsidiaries and/or affiliates use the Check Point '932 Products in regular business operations.

116.    Check Point has directly infringed and continues to directly infringe the '932 patent by, among other things, making, using, offering for sale, and/or selling technology that utilize flow state information to perform a method of network tunneling.

117.    One or more of the Check Point '932 Products utilize flow state information to perform a network tunneling method.

118.    One or more of the Check Point '932 Products create a flow block having flow state information for a received first data packet of a micro-flow.

119.    One or more of the Check Point '932 Products store a tunnel identifier for the micro-flow in the flow block, the tunnel identifier identifying a selected network tunnel to be used to transmit the data packet.

120.    One or more of the Check Point '932 Products index an aggregate flow block using the tunnel identifier.

121.    One or more of the Check Point '932 Products utilize an aggregate flow block with tunnel specific information for the selected network tunnel and that stores statistics for the selected network tunnel.

122.    One or more of the Check Point '932 Products transmit data packets using the selected network tunnel based on the tunnel specific information.

123.    The Check Point '932 Products are available to businesses and individuals throughout the United States.

124.    The Check Point '932 Products are provided to businesses and individuals located in the State of Delaware.

125.    By making, using, testing, offering for sale, and/or selling products utilizing flow state information to perform a method of network tunneling, including but not limited to the Check Point '932 Products, Check Point has injured Plaintiffs and is liable to Plaintiffs for directly infringing one or more claims of the '932 patent, including at least claim 1 pursuant to 35 U.S.C. § 271(a).

126.    Check Point also indirectly infringes the '932 patent by actively inducing infringement under 35 USC § 271(b).

127.    On information and belief, Check Point has had knowledge of the '932 patent since at least April 13, 2020, or shortly thereafter.

128.    On April 13, 2020, Plaintiffs filed suit against Cisco Systems, Inc. in the United States District Court for the Western District of Texas asserting, among other claims, infringement of the '932 patent.  On June 15, 2020, Plaintiffs filed suit against Juniper Networks, Inc. in the United States District Court for the Western District of Texas asserting, among other claims, infringement of the '932 patent.  On June 16, 2020, Plaintiffs filed suit against Fortinet, Inc. in the United States District Court for the Eastern District of Texas asserting, among other claims, infringement of the '932 patent.  On June 18, 2020, Plaintiffs filed suit against Palo Alto Networks, Inc. in the United States District Court for the Eastern District of Texas asserting, among other claims, infringement of the '932 patent.  On June 26, 2020, Plaintiffs filed suit against Dell Technologies Inc.; Dell Inc.; and EMC Corporation (collectively, "Dell") in the United States

District Court for the Western District of Texas asserting, among other claims, infringement of the '932 patent.  On June 30, 2020, Plaintiffs filed suit against Hewlett Packard Enterprise Company and Aruba Networks, Inc. (collectively, "HPE") in the United States District Court for the Eastern District of Texas asserting, among other claims, infringement of the '932 patent.  On September 1, 2020, Plaintiffs filed suit against Nokia Corporation, Nokia of America Corporation, and Nokia Solutions and Networks Oy (collectively, "Nokia") in the United States District Court for the Western District of Texas asserting, among other claims, infringement of the '932 patent.

129.    On information and belief, Cisco Systems, Inc.; Juniper Networks, Inc.; Fortinet, Inc.; Palo Alto Networks, Inc.; Dell; HPE; and Nokia are competitors of Check Point.   On information and belief, Check Point monitors patent infringement lawsuits involving the assertion of pioneering patents in the field of computer networking against Check Point's competitors, including Plaintiffs' assertion of the '932 patent against Cisco Systems, Inc.; Juniper Networks, Inc.; Fortinet, Inc.; Palo Alto Networks, Inc.; Dell; HPE; and Nokia.

130.    In particular, Plaintiffs asserted that the following Palo Alto Networks, Inc. products infringed the '932 patent: PA-Series Firewall Appliances with PAN-OS 7.1 and later, which include at least the following models (PA-200 Firewall, PA-220 Firewall, PA-220R Firewall, PA-500 Firewall, PA-800 Series Firewalls, PA-2000 Series Firewalls, PA-3000 Series Firewalls, PA-3200 Series Firewalls, PA-4000 Series Firewalls, PA-5000 Series Firewalls, PA-5200 Series Firewalls, and PA-7000 Series Firewalls) and VM-Series Firewalls  with PAN-OS 7.1 and later, which include at least the following models (VM-50 Firewall, M-100 Firewall, VM-200 Firewall, VM-300 Firewall, VM-500 Firewall, VM-700 Firewall,  and VM-1000-HV Firewall). Plaintiffs asserted that Fortinet, Inc. products infringed the '932 patent: FG/FWF-60E; FG-80E; FG-90E ; FG-100E; FG-200E ; FG-300D ; FG-300E; FG-400D ; FG-400E; FG-500D; FG-500E;

FG-600D ; FG-600E ; FG-800D ; FG-900D; FG-1000D; FG-1100E; FG-1200D; FG-1500D; FG-2000E; FG-2500E; FG-3000D; FG-3100D; FG-3200D; FG-3400E; FG-3600E; FG-3700D; FG-3800D; FG-3810D; FG-3815D; FG-3960E; FG-3980E; FG-5001D; FG-5001E; FG-VM00; and FG-VM01.   The infringing functionality of the Check Point '932 Products operates in a substantially similar manner to the Fortinet, Inc. and Palo Alto Networks, Inc. products Plaintiffs accused of infringing the '932 patent.   Moreover, the Check Point '932 Products are direct competitors of the Fortinet, Inc. and Palo Alto Networks, Inc. products Plaintiffs accused of infringing the '932 patent.

131.   Accordingly, on or shortly after April 13, 2020, on information and belief, Check Point reviewed the '932 patent and the allegations that Check Point's competitors' products infringed the '932 patent and learned that the Check Point '932 Products also infringed the '932 patent.

132.   Alternatively, Check Point has had knowledge of the '932 patent since at least service of this Complaint or shortly thereafter, and Check Point knew of the '932 patent and knew of its infringement, including by way of this lawsuit.

133.   Check Point intended to induce patent infringement by third-party customers and users of the Check Point '932 Products and had knowledge that the inducing acts would cause infringement or was willfully blind to the possibility that its inducing acts would cause infringement.  Check Point specifically intended and was aware that the normal and customary use of the accused products would infringe the '932 patent.  Check Point performed the acts that constitute induced infringement, and would induce actual infringement, with knowledge of the '932 patent and with the knowledge that the induced acts would constitute infringement.  For example, Check Point provides the Check Point '932 Products that have the capability of operating

in a manner that infringe one or more of the claims of the '932 patent, including at least claim 1, and Check Point further provides documentation and training materials that cause customers and end users of the Check Point '932 Products to utilize the products in a manner that directly infringe one or more claims of the '932 patent.[20]  By providing instruction and training to customers and end-users on how to use the Check Point '932 Products in a manner that directly infringes one or more claims of the '932 patent, including at least claim 1, Check Point specifically intended to induce infringement of the '932 patent.  Check Point engaged in such inducement to promote the sales of the Check Point '932 Products, e.g., through Check Point user manuals, product support, marketing materials, and training materials to actively induce the users of the accused products to infringe the '932 patent.  Accordingly, Check Point has induced and continues to induce users of the accused products to use the accused products in their ordinary and customary way to infringe the '932 patent, knowing that such use constitutes infringement of the '932 patent.

134.   The '932 patent is well-known within the industry as demonstrated by multiple citations to the '932 patent in published patents and patent applications assigned to technology companies and academic institutions.  Check Point is utilizing the technology claimed in the '932 patent without paying a reasonable royalty.  Check Point is infringing the '932 patent in a manner

---

[20] *See, e.g.*, *1500 Appliance Series R80.20.10 Local Management Administration Guide*, CHECK POINT DOCUMENTATION (November 16, 2020); Sung Yang, *Next Generation Policy Management R80.10 Training Technologies Training Material,* CHECK POINT PRESENTATION (2018); *Carrier Security R81 Administration Guide,* CHECK POINT DOCUMENTATION (September 29, 2020); *1500 Appliance Services R80.20.15 Centrally Managed Help Guide*, CHECK POINT DOCUMENTATION (October 18, 2020); *QoS R81 Administration Guide,* CHECK POINT DOCUMENTATION (September 24, 2020); *1500 Appliance Services R80.20.15 Centrally Managed Administration Guide*, CHECK POINT DOCUMENTATION (January 21, 2021); *Gaia R80.30 Administration Guide,* CHECK POINT DOCUMENTATION (March 24, 2019); *Quantum Spark 1500, 1600 and 1800 Appliance Series R80.20.20 Release Notes*, CHECK POINT DOCUMENTATION (February 1, 2021); *Quantum Spark 1500, 1600 and 1800 Appliance Series R80.20.20 Locally Managed Administration Guide,* CHECK POINT DOCUMENTATION (January 26, 2021); and Roman Dario Perez, *Check Point's Latest Major Software Release R81 Workshop,* CHECK POINT PRESENTATION (2020).

best described as willful, wanton, malicious, in bad faith, deliberate, consciously wrongful, flagrant, or characteristic of a pirate.

135.    To the extent applicable, the requirements of 35 U.S.C. § 287(a) have been met with respect to the '932 patent.

136.    As a result of Check Point's infringement of the '932 patent, Plaintiffs have suffered monetary damages, and seek recovery in an amount adequate to compensate for Check Point's infringement, but in no event less than a reasonable royalty for the use made of the invention by Check Point together with interest and costs as fixed by the Court.

## COUNT III
## INFRINGEMENT OF U.S. PATENT NO. 8,085,775

137.    Plaintiffs reference and incorporate by reference the preceding paragraphs of this Complaint as if fully set forth herein.

138.    Check Point designs, makes, uses, sells, and/or offers for sale in the United States products and/or services for identifying and handling a single application flow of a plurality of information packets.

139.    Check Point designs, makes, sells, offers to sell, imports, and/or uses Check Point Smart-1 Security Appliances with Gaia OS R80.10 and later (including models: 5b, 50, 150, 205, 210, 225, 405, 410, 525, 625, 3050, 3150, 5050, 5150, 6000-L, and 6000-XL) and Check Point Security Gateway devices with Gaia OS R80.10 and later (including models: 2200, 3000, 3600, 3800, 4000, 5000, 5900, 6200B, 6200P, 6200T, 6400, 6500, 6600, 6700, 6800, 6900, 7000, 12000, 12200, 12400, 12600, 13000, 15000, 16000, 16000T, 16200, 16600 HS, 21000, 23000, 26000, 26000T, 28000, and 28600 HS) (collectively, the "Check Point '775 Products(s)").

140.    One or more Check Point subsidiaries and/or affiliates use the Check Point '775 Products in regular business operations.

141.    One or more of the Check Point '775 Products include technology for identifying and handling a single application flow of a plurality of information packets.

142.    Check Point has directly infringed and continues to directly infringe the '775 patent by, among other things, making, using, offering for sale, and/or selling technology for identifying and handling a single application flow of a plurality of information packets, including but not limited to the Check Point '775 Products.

143.    One or more of the Check Point '775 Products creates a flow block as the first packet of a flow is processed by a router.

144.    One or more of the Check Point '775 Products utilize a flow block adapted to store payload-content agnostic behavioral statistics about the flow.

145.    One or more of the Check Point '775 Products update the flow block with the flow's payload-content agnostic behavioral statistics as packets belonging to the flow are processed by the router.

146.    One or more of the Check Point '775 Products utilize a flow incapable of being identified by header information alone.

147.    One or more of the Check Point '775 Products heuristically determine whether at least one user-specified policy is satisfied by the payload-content agnostic behavioral statistics stored in the flow block.

148.    One or more of the Check Point '775 Products apply to at least one packet belonging to at least one user-specified action that is mapped to the user-specified policy that is satisfied by the payload-content agnostic behavioral statistics upon determining that the user-specified policy is satisfied by the payload-content agnostic behavioral statistics.

149.     One or more of the Check Point '775 Products include functionality wherein the payload-content agnostic behavioral statistics for the flow are calculated by the router.

150.     One or more of the Check Point '775 Products include functionality wherein the payload-content agnostic behavioral statistics reflect the empirical behavior of the flow.

151.     One or more of the Check Point '775 Products include functionality wherein at least one of the payload-content agnostic behavioral statistics is chosen from the group consisting of: (1) total byte count accumulated for the flow, (2) flow life duration, (3) average rate of flow, (4) average packet size, (5) average packet rate, (6) average inter-packet gap, (7) instantaneous flow rate, and (8) moving average flow rate.

152.     The Check Point '775 Products are available to businesses and individuals throughout the United States.

153.     The Check Point '775 Products are provided to businesses and individuals located in the State of Delaware.

154.     By making, using, testing, offering for sale, and/or selling products and services for identifying and handling a single application flow of a plurality of information packets, including but not limited to the Check Point '775 Products, Check Point has injured Plaintiffs and is liable to Plaintiffs for directly infringing one or more claims of the '775 patent, including at least claim 1 pursuant to 35 U.S.C. § 271(a).

155.     Check Point also indirectly infringes the '775 patent by actively inducing infringement under 35 USC § 271(b).

156.     On information and belief, Check Point has had knowledge of the '775 patent since at least April 13, 2020, or shortly thereafter.

157.    On April 13, 2020, Plaintiffs filed suit against Cisco Systems, Inc. in the United States District Court for the Western District of Texas asserting, among other claims, infringement of the '775 patent.  On June 15, 2020, Plaintiffs filed suit against Juniper Networks, Inc. in the United States District Court for the Western District of Texas asserting, among other claims, infringement of the '775 patent.  On June 16, 2020, Plaintiffs filed suit against Fortinet, Inc. in the United States District Court for the Eastern District of Texas asserting, among other claims, infringement of the '775 patent.  On June 18, 2020, Plaintiffs filed suit against Palo Alto Networks, Inc. in the United States District Court for the Eastern District of Texas asserting, among other claims, infringement of the '775 patent.  On June 30, 2020, Plaintiffs filed suit against Hewlett Packard Enterprise Company and Aruba Networks, Inc. (collectively, "HPE") in the United States District Court for the Eastern District of Texas asserting, among other claims, infringement of the '775 patent.

158.    On information and belief, Cisco Systems, Inc.; Juniper Networks, Inc.; Fortinet, Inc.; Palo Alto Networks, Inc.; and HPE are competitors of Check Point.  On information and belief, Check Point monitors patent infringement lawsuits involving the assertion of pioneering patents in the field of computer networking against Check Point's competitors, including Plaintiffs' assertion of the '775 patent against Cisco Systems, Inc.; Juniper Networks, Inc.; Fortinet, Inc.; Palo Alto Networks, Inc.; and HPE.

159.    In particular, Plaintiffs asserted that the following Palo Alto Networks, Inc. products infringed the '775 patent: PA-Series Firewall Appliances with PAN-OS 7.1 and later, which include at least the following models: PA-200 Firewall, PA-220 Firewall, PA-220R Firewall, PA-500 Firewall, PA-800 Series Firewalls, PA-2000 Series Firewalls, PA-3000 Series Firewalls, PA-3200 Series Firewalls, PA-4000 Series Firewalls, PA-5000 Series Firewalls, PA-

5200 Series Firewalls, and PA-7000 Series Firewalls, and VM-Series Firewalls with PAN-OS 7.1 and later, which include at least the following models: VM-50 Firewall, M-100 Firewall, VM-200 Firewall, VM-300 Firewall, VM-500 Firewall, VM-700 Firewall, and the VM-1000-HV Firewall. Plaintiffs asserted that Fortinet, Inc. products infringed the '775 patent: FG/FWF-60E; FG-80E; FG-90E ; FG-100E; FG-200E ; FG-300D ; FG-300E; FG-400D ; FG-400E; FG-500D; FG-500E; FG-600D ; FG-600E ; FG-800D ; FG-900D; FG-1000D; FG-1100E; FG-1200D; FG-1500D; FG-2000E; FG-2500E; FG-3000D; FG-3100D; FG-3200D; FG-3400E; FG-3600E; FG-3700D; FG-3800D; FG-3810D; FG-3815D; FG-3960E; FG-3980E; FG-5001D; FG-5001E; FG-VM00; and FG-VM01.   The infringing functionality of the Check Point '775 Products operates in a substantially similar manner to the Fortinet, Inc. and Palo Alto Networks, Inc. products Plaintiffs accused of infringing the '775 patent.   Moreover, the Check Point '775 Products are direct competitors of the Fortinet, Inc. and Palo Alto Networks, Inc. products Plaintiffs accused of infringing the '775 patent.

160.   Accordingly, on or shortly after April 13, 2020, on information and belief, Check Point reviewed the '775 patent and the allegations that Check Point's competitors' products infringed the '775 patent and learned that the Check Point '775 Products also infringed the '775 patent.

161.   Alternatively, Check Point has had knowledge of the '775 patent since at least service of this Complaint or shortly thereafter, and Check Point knew of the '775 patent and knew of its infringement, including by way of this lawsuit.

162.   Check Point intended to induce patent infringement by third-party customers and users of the Check Point '775 Products and had knowledge that the inducing acts would cause infringement or was willfully blind to the possibility that its inducing acts would cause

infringement.  Check Point specifically intended and was aware that the normal and customary use of the accused products would infringe the '775 patent.  Check Point performed the acts that constitute induced infringement, and would induce actual infringement, with knowledge of the '775 patent and with the knowledge that the induced acts would constitute infringement.  For example, Check Point provides the Check Point '775 Products that have the capability of operating in a manner that infringe one or more of the claims of the '775 patent, including at least claim 1, and Check Point further provides documentation and training materials that cause customers and end users of the Check Point '775 Products to utilize the products in a manner that directly infringe one or more claims of the '775 patent.[21]  By providing instruction and training to customers and end-users on how to use the Check Point '775 Products in a manner that directly infringes one or more claims of the '775 patent, including at least claim 1, Check Point specifically intended to induce infringement of the '775 patent.  Check Point engaged in such inducement to promote the sales of the Check Point '775 Products, e.g., through Check Point user manuals, product support, marketing materials, and training materials to actively induce the users of the accused products to infringe the '775 patent.  Accordingly, Check Point has induced and continues to induce users of

---

[21] *See, e.g., Check Point R80.10 Next Generation Threat Prevention Platforms: Security Gateway Architecture of the Future,* CHECK POINT WHITE PAPER (2017); *Check Point Application Control Self Help Guide,* CHECK POINT DOCUMENTATION (September 12, 2019); *Check Point Application Control Administration Guide,* CHECK POINT ADMINISTRATION GUIDE (November 1, 2017); *Check Point Tutorial: Configuring Application Control,* Check Point YouTube Channel (November 20, 2016), *available at*: https://www.youtube.com/watch?v=Sl3XohItwN8; *ATRG: Application Control Solution ID: sk73220,* CHECK POINT SUPPORT CENTER ARTICLE (January 2, 2021); *Check Point R80.10 Release Notes,* CHECK POINT DOCUMENTATION (July 27, 2019); *Check Point Next Generation Security Gateway R80.10 GUIDE,* CHECK POINT DOCUMENTATION (May 16, 2017); Pater Elmer, *Securing Office 365 Using NGTP To Protect Access To Office 365 Services,* CHECK POINT PRESENTATION (November 2016); *Check Point Best Practice – Application Control Solution ID: sk112249,* CHECK POINT SUPPORT CENTER (November 11, 2020); *Check Point Security Management R10.10 (Part of Check Point Infinity) Administration Guide,* CHECK POINT DOCUMENTATION (February 11, 2021); *Check Point R80.10 Unified Access Control Policy*, CHECK POINT YOUTUBE SUPPORT CHANNEL (June 5, 2017), *available at*: https://www.youtube.com/watch?v=AN1N8cwkjJk; and *Exceptions For Applications - Customizing The Application Signature Matching Process Solution ID: sk116601,* CHECK POINT SUPPORT CENTER (May 1, 2017).

the accused products to use the accused products in their ordinary and customary way to infringe the '775 patent, knowing that such use constitutes infringement of the '775 patent.

163.     The '775 patent is well-known within the industry as demonstrated by multiple citations to the '775 patent in published patents and patent applications assigned to technology companies and academic institutions.  Check Point is utilizing the technology claimed in the '775 patent without paying a reasonable royalty.  Check Point is infringing the '775 patent in a manner best described as willful, wanton, malicious, in bad faith, deliberate, consciously wrongful, flagrant, or characteristic of a pirate.

164.     To the extent applicable, the requirements of 35 U.S.C. § 287(a) have been met with respect to the '775 patent.

165.     As a result of Check Point's infringement of the '775 patent, Plaintiffs have suffered monetary damages, and seek recovery in an amount adequate to compensate for Check Point's infringement, but in no event less than a reasonable royalty for the use made of the invention by Check Point together with interest and costs as fixed by the Court.

## COUNT IV
## INFRINGEMENT OF U.S. PATENT NO. 8,243,593

166.     Plaintiffs reference and incorporate by reference the preceding paragraphs of this Complaint as if fully set forth herein.

167.     Check Point designs, makes, uses, sells, and/or offers for sale in the United States products and/or services for processing a flow of a series of information packets.

168.     Check Point designs, makes, sells, offers to sell, imports, and/or uses Check Point DDoS Protector Appliances (including the following models: DP 6, DP 20, DP 60, DP 110, DP 200, DP 220, and DP 400), the Check Point Hybrid Cloud DDoS Protection Service, Check Point DDoS Behavioral Protection and IPS Updates For DDoS Protector (including the following

models: 6-3, 6-2, 6-1, 6-05, 6-02, 20-12, 20-8, 20-4, 60-40, 110-40S (SSL), 200-80, 220-120S (SSL), and 400-160), the Check Point Active Attackers Feed Subscription for DDoS Protector (including the following models: 6-5, 6-3, 6-2, 6-1, 6-05, 6-02, 20-12, 20-8, 20-4, 20-2, 60-40, 60-20, 60-10, 110-40S (SSL), 200-80, 220-120S (SSL), and 400-160), the Check Point On-Demand Cloud DDoS Service, the Check Point Always-On Cloud DDoS Service, the Check Point DDoS Vision Management Appliances (VL2 Appliance and VA2 Virtual Appliance), the Check Point DDoS Management Upgrade (Managed Unlimited DDoS Protector Physical Devices), the Check Point Vision Management Right to Use (RTU) Product (200 Virtual Instances and 60 Virtual Instances), the Check Point APSolute Vision Analytics (AMS) Product, and the Check Point APSolute Vision Reporter (AVR) Product (collectively, the "Check Point '593 Product(s)").

169.    One or more Check Point subsidiaries and/or affiliates use the Check Point '593 Products in regular business operations.

170.    One or more of the Check Point '593 Products include technology for processing a flow of a series of information packets.  Specifically, the Check Point '593 Products maintain a set of behavioral statistics based on each and every information packet belonging to a flow.

171.    The Check Point '593 Products are available to businesses and individuals throughout the United States.

172.    The Check Point '593 Products are provided to businesses and individuals located in the State of Delaware.

173.    Check Point has directly infringed and continues to directly infringe the '593 patent by, among other things, making, using, offering for sale, and/or selling products and services for processing a flow of a series of information packets.

174.    The Check Point '593 Products maintain a set of behavioral statistics for the flow, wherein the set of behavioral statistics is updated based on each information packet belonging to the flow, as each information packet is processed.

175.    The Check Point '593 Products enable the generation of behavioral statistics based on each packet that is processed.

176.    The Check Point '593 Products determine, based at least partially upon the set of behavioral statistics, whether the flow is exhibiting undesirable behavior.

177.    The Check Point '593 Products determine whether the flow is exhibiting undesirable behavior regardless of the presence or absence of congestion.

178.    The Check Point '593 Products enforce a penalty on the flow in response to a determination that the flow is exhibiting undesirable behavior.

179.    By making, using, testing, offering for sale, and/or selling products and services for processing a flow of a series of information packets, including but not limited to the Check Point '593 Products, Check Point has injured Plaintiffs and is liable for directly infringing one or more claims of the '593 patent, including at least claim 4, pursuant to 35 U.S.C. § 271(a).

180.    Check Point also indirectly infringes the '593 patent by actively inducing infringement under 35 USC § 271(b).

181.    On information and belief, Check Point has had knowledge of the '593 patent since at least June 15, 2020, or shortly thereafter.

182.    On June 15, 2020, Plaintiffs filed suit against Juniper Networks, Inc. in the United States District Court for the Western District of Texas asserting, among other claims, infringement of the '593 patent.  On June 16, 2020, Plaintiffs filed suit against Fortinet, Inc. in the United States District Court for the Eastern District of Texas asserting, among other claims, infringement of the

'593 patent.  On June 18, 2020, Plaintiffs filed suit against Palo Alto Networks, Inc. in the United States District Court for the Eastern District of Texas asserting, among other claims, infringement of the '593 patent.  On June 26, 2020, Plaintiffs filed suit against Dell Technologies Inc.; Dell Inc.; and EMC Corporation (collectively, "Dell") in the United States District Court for the Western District of Texas asserting, among other claims, infringement of the '593 patent.  On June 30, 2020, Plaintiffs filed suit against Hewlett Packard Enterprise Company and Aruba Networks, Inc. (collectively, "HPE") in the United States District Court for the Eastern District of Texas asserting, among other claims, infringement of the '593 patent.  On September 1, 2020, Plaintiffs filed suit against Nokia Corporation, Nokia of America Corporation, and Nokia Solutions and Networks Oy (collectively, "Nokia") in the United States District Court for the Western District of Texas asserting, among other claims, infringement of the '593 patent.

183.    On information and belief, Juniper Networks, Inc.; Fortinet, Inc.; Palo Alto Networks, Inc.; Dell; HPE; and Nokia are competitors of Check Point.  On information and belief, Check Point monitors patent infringement lawsuits involving the assertion of pioneering patents in the field of computer networking against Check Point's competitors, including Plaintiffs' assertion of the '593 patent against Juniper Networks, Inc.; Fortinet, Inc.; Palo Alto Networks, Inc.; Dell; HPE; and Nokia.

184.    In particular, Plaintiffs asserted that the following Palo Alto Networks, Inc. products infringed the '593 patent: PA-200 Firewall, PA-220 Firewall, PA-220R Firewall, PA-500 Firewall, PA-800 Series Firewalls, PA-2000 Series Firewalls, PA-3000 Series Firewalls, PA-3200 Series Firewalls, PA-4000 Series Firewalls, PA-5000 Series Firewalls, PA-5200 Series Firewalls, and PA-7000 Series Firewalls, and VM-Series Firewalls  with PAN-OS 6.0 and later, which include at least the following models: VM-50 Firewall, M-100 Firewall, VM-200 Firewall, VM-

300 Firewall, VM-500 Firewall, VM-700 Firewall, and VM-1000-HV Firewall.  Plaintiffs asserted

that Fortinet, Inc. products infringed the '593 patent: FG/FWF-60E; FG-80E; FG-90E ; FG-100E;

FG-200E ; FG-300D ; FG-300E; FG-400D ; FG-400E; FG-500D; FG-500E; FG-600D ; FG-600E

; FG-800D ; FG-900D; FG-1000D; FG-1100E; FG-1200D; FG-1500D; FG-2000E; FG-2500E;

FG-3000D; FG-3100D; FG-3200D; FG-3400E; FG-3600E; FG-3700D; FG-3800D; FG-3810D;

FG-3815D; FG-3960E; FG-3980E; FG-5001D; FG-5001E; FG-VM00;  and  FG-VM01.   The

infringing functionality of the Check Point '593 Products operates in a substantially similar manner

to the Fortinet, Inc. and Palo Alto Networks, Inc. products Plaintiffs accused of infringing the '593

patent.  Moreover, the Check Point '593 Products are direct competitors of the Fortinet, Inc. and

Palo Alto Networks, Inc. products Plaintiffs accused of infringing the '593 patent.

185.    Accordingly, on or shortly after June 15, 2020, on information and belief, Check

Point reviewed the '593 patent and the allegations that Check Point's competitors' products

infringed the '593 patent and learned that the Check Point '593 Products also infringed the '593

patent.

186.    Alternatively, Check Point has had knowledge of the '593 patent since at least

service of this Complaint or shortly thereafter, and Check Point knew of the '593 patent and knew

of its infringement, including by way of this lawsuit.

187.    Check Point intended to induce patent infringement by third-party customers and

users of the Check Point '593 Products and had knowledge that the inducing acts would cause

infringement or was willfully blind to the possibility that its inducing acts would cause

infringement.  Check Point specifically intended and was aware that the normal and customary use

of the accused products would infringe the '593 patent.  Check Point performed the acts that

constitute induced infringement, and would induce actual infringement, with knowledge of the

'593 patent and with the knowledge that the induced acts would constitute infringement. For example, Check Point provides the Check Point '593 Products that have the capability of operating in a manner that infringe one or more of the claims of the '593 patent, including at least claim 4, and Check Point further provides documentation and training materials that cause customers and end users of the Check Point '593 Products to utilize the products in a manner that directly infringe one or more claims of the '593 patent.[22] By providing instruction and training to customers and end-users on how to use the Check Point '593 Products in a manner that directly infringes one or more claims of the '593 patent, including at least claim 4, Check Point specifically intended to induce infringement of the '593 patent. Check Point engaged in such inducement to promote the sales of the Check Point '593 Products, e.g., through Check Point user manuals, product support, marketing materials, and training materials to actively induce the users of the accused products to infringe the '593 patent. Accordingly, Check Point has induced and continues to induce users of the accused products to use the accused products in their ordinary and customary way to infringe the '593 patent, knowing that such use constitutes infringement of the '593 patent.

188.    The '593 patent is well-known within the industry as demonstrated by multiple citations to the '593 patent in published patents and patent applications assigned to technology companies and academic institutions. Check Point is utilizing the technology claimed in the '593

---

[22] *See, e.g.*, *Check Point DDoS Protector – DDoS Protection and Attack Mitigation*, CHECK POINT DATA SHEET (June 18, 2020); *Check Point DDoS Protector – Technical Overview | DDoS Protection*, CHECK POINT SOFTWARE TECHNOLOGIES YOUTUBE CHANNEL (March 20, 2013), *available at*: https://www.youtube.com/watch?v=omucYUOl8rU; Ramandeep Singh, *Demystifying DDoS,* CHECK POINT PRESENTATION (2015); *Check Point DDoS Protector User Guide Version 6.14,* CHECK POINT DOCUMENTATION (September 17, 2017); *Check Point Support Center – Best Practices – DDoS Attacks on Check Point Security Gateway, Check Point Documentation Solution ID SIK112241* (July 11, 2016); *Check Point DDoS Protection on the Security Gateway – Best Practices*, CHECK POINT DOCUMENTATION (August 24, 2014); *Check Point DDoS External CLI File Management Reference Manual,* CHECK POINT DOCUMENTATION (October 31, 2017); and *Check Point DDoS Protector 6.14.12 User Guide*, CHECK POINT DOCUMENTATION (March 15, 2020).

patent without paying a reasonable royalty.  Check Point is infringing the '593 patent in a manner best described as willful, wanton, malicious, in bad faith, deliberate, consciously wrongful, flagrant, or characteristic of a pirate.

189.    To the extent applicable, the requirements of 35 U.S.C. § 287(a) have been met with respect to the '593 patent.

190.    As a result of Check Point's infringement of the '593 patent, Plaintiffs have suffered monetary damages, and seek recovery in an amount adequate to compensate for Check Point's infringement, but in no event less than a reasonable royalty for the use made of the invention by Check Point together with interest and costs as fixed by the Court.

<u>COUNT V</u>
<u>INFRINGEMENT OF U.S. PATENT NO. 8,817,790</u>

191.    Plaintiffs reference and incorporate by reference the preceding paragraphs of this Complaint as if fully set forth herein.

192.    Check Point designs, makes, uses, sells, and/or offers for sale in the United States products and/or services for handling a flow of information packets.

193.    Check Point designs, makes, sells, offers to sell, imports, and/or uses Check Point Smart-1 Security Appliances with Gaia OS R80.10 and later (including models: 5b, 50, 150, 205, 210, 225, 405, 410, 525, 625, 3050, 3150, 5050, 5150, 6000-L, and 6000-XL) and Check Point Security Gateway devices with Gaia OS R80.10 and later (including models: 2200, 3000, 3600, 3800, 4000, 5000, 5900, 6200B, 6200P, 6200T, 6400, 6500, 6600, 6700, 6800, 6900, 7000, 12000, 12200, 12400, 12600, 13000, 15000, 16000, 16000T, 16200, 16600 HS, 21000, 23000, 26000, 26000T, 28000, and 28600 HS) (collectively, the "Check Point '790 Products(s)").

194.    One or more Check Point subsidiaries and/or affiliates use the Check Point '790 Products in regular business operations.

195.     One or more of the Check Point '790 Products include technology for handling a flow of information packets.  Specifically, the Check Point '790 Product process information packets that have the same header information.

196.     The Check Point '790 Products are available to businesses and individuals throughout the United States.

197.     The Check Point '790 Products are provided to businesses and individuals located in the State of Delaware.

198.     Check Point has directly infringed and continues to directly infringe the '790 patent by, among other things, making, using, offering for sale, and/or selling technology for handling a flow of information packets, including but not limited to the Check Point '790 Products.

199.     The Check Point '790 Products process a flow comprised of two or more information packets having header information in common.  Further, the Check Point '790 Products use header-independent statistics for traffic classification.  These statistics include bit rate, packet counts, and byte counts that are used to identify a particular traffic type.

200.     The Check Point '790 Products store header-independent statistics about the flow in a flow block associated with the flow.

201.     The Check Point '790 Products perform traffic matching using header-independent statistics such as: total number of input packets, total number of output packets, input bit rates, and output bit rates.

202.     The Check Point '790 Products update the header-independent statistics in the flow block as each information packet belonging to the flow is processed.  The header-independent statistics are stored in a flow block associated with the flow.

203.    The Check Point '790 Products categorize the flow as one or more traffic types by determining whether the header-independent statistics match one or more profiles corresponding to a traffic type.

204.    The Check Point '790 Products perform an operation that is determined according to the one or more traffic types on one or more information packets belonging to the flow if the one or more traffic types match one or more particular traffic types designated by a user.

205.    By making, using, testing, offering for sale, and/or selling products and services, including but not limited to the Check Point '790 Products, Check Point has injured Plaintiffs and is liable for directly infringing one or more claims of the '790 patent, including at least claim 1, pursuant to 35 U.S.C. § 271(a).

206.    Check Point also indirectly infringes the '790 patent by actively inducing infringement under 35 USC § 271(b).

207.    On information and belief, Check Point has had knowledge of the '790 patent since at least April 13, 2020, or shortly thereafter.

208.    On April 13, 2020, Plaintiffs filed suit against Cisco Systems, Inc. in the United States District Court for the Western District of Texas asserting, among other claims, infringement of the '790 patent.  On June 15, 2020, Plaintiffs filed suit against Juniper Networks, Inc. in the United States District Court for the Western District of Texas asserting, among other claims, infringement of the '790 patent.  On June 16, 2020, Plaintiffs filed suit against Fortinet, Inc. in the United States District Court for the Eastern District of Texas asserting, among other claims, infringement of the '790 patent.  On June 18, 2020, Plaintiffs filed suit against Palo Alto Networks, Inc. in the United States District Court for the Eastern District of Texas asserting, among other claims, infringement of the '790 patent.  On June 30, 2020, Plaintiffs filed suit against Hewlett

Packard Enterprise Company and Aruba Networks, Inc. (collectively, "HPE") in the United States District Court for the Eastern District of Texas asserting, among other claims, infringement of the '790 patent.  On September 1, 2020, Plaintiffs filed suit against Nokia Corporation, Nokia of America Corporation, and Nokia Solutions and Networks Oy (collectively, "Nokia") in the United States District Court for the Western District of Texas asserting, among other claims, infringement of the '790 patent.

209.   On information and belief, Cisco Systems, Inc.; Juniper Networks, Inc.; Fortinet, Inc.; Palo Alto Networks, Inc.; HPE; and Nokia are competitors of Check Point.  On information and belief, Check Point monitors patent infringement lawsuits involving the assertion of pioneering patents in the field of computer networking against Check Point's competitors, including Plaintiffs' assertion of the '790 patent against Cisco Systems, Inc.; Juniper Networks, Inc.; Fortinet, Inc.; Palo Alto Networks, Inc.; HPE; and Nokia.

210.   In particular, Plaintiffs asserted that the following Palo Alto Networks, Inc. products infringed the '790 patent: PA-200 Firewall, PA-220 Firewall, PA-220R Firewall, PA-500 Firewall, PA-800 Series Firewalls, PA-2000 Series Firewalls, PA-3000 Series Firewalls, PA-3200 Series Firewalls, PA-4000 Series Firewalls, PA-5000 Series Firewalls, PA-5200 Series Firewalls, and PA-7000 Series Firewalls, and VM-Series Firewalls with PAN-OS 7.1 and later, which includes at least the following models: VM-50 Firewall, M-100 Firewall, VM-200 Firewall, VM-300 Firewall, VM-500 Firewall, VM-700 Firewall,  and VM-1000-HV Firewall.  Plaintiffs asserted that Fortinet, Inc. products infringed the '790 patent: FG/FWF-60E; FG-80E; FG-90E ; FG-100E; FG-200E ; FG-300D ; FG-300E; FG-400D ; FG-400E; FG-500D; FG-500E; FG-600D ; FG-600E ; FG-800D ; FG-900D; FG-1000D; FG-1100E; FG-1200D; FG-1500D; FG-2000E; FG-2500E; FG-3000D; FG-3100D; FG-3200D; FG-3400E; FG-3600E; FG-3700D; FG-3800D;

FG-3810D; FG-3815D; FG-3960E; FG-3980E; FG-5001D; FG-5001E; FG-VM00; and FG-VM01.  The infringing functionality of the Check Point '790 Products operates in a substantially similar manner to the Fortinet, Inc. and Palo Alto Networks, Inc. products Plaintiffs accused of infringing the '790 patent.  Moreover, the Check Point '790 Products are direct competitors of the Fortinet, Inc. and Palo Alto Networks, Inc. products Plaintiffs accused of infringing the '790 patent.

211.    Accordingly, on or shortly after April 13, 2020, on information and belief, Check Point reviewed the '790 patent and the allegations that Check Point's competitors' products infringed the '790 patent and learned that the Check Point '790 Products also infringed the '790 patent.

212.    Alternatively, Check Point has had knowledge of the '790 patent since at least service of this Complaint or shortly thereafter, and Check Point knew of the '790 patent and knew of its infringement, including by way of this lawsuit.

213.    Check Point intended to induce patent infringement by third-party customers and users of the Check Point '790 Products and had knowledge that the inducing acts would cause infringement or was willfully blind to the possibility that its inducing acts would cause infringement.  Check Point specifically intended and was aware that the normal and customary use of the accused products would infringe the '790 patent.  Check Point performed the acts that constitute induced infringement, and would induce actual infringement, with knowledge of the '790 patent and with the knowledge that the induced acts would constitute infringement.  For example, Check Point provides the Check Point '790 Products that have the capability of operating in a manner that infringe one or more of the claims of the '790 patent, including at least claim 1, and Check Point further provides documentation and training materials that cause customers and

end users of the Check Point '790 Products to utilize the products in a manner that directly infringe one or more claims of the '790 patent.23  By providing instruction and training to customers and end-users on how to use the Check Point '790 Products in a manner that directly infringes one or more claims of the '790 patent, including at least claim 1, Check Point specifically intended to induce infringement of the '790 patent.  Check Point engaged in such inducement to promote the sales of the Check Point '790 Products, e.g., through Check Point user manuals, product support, marketing materials, and training materials to actively induce the users of the accused products to infringe the '790 patent.  Accordingly, Check Point has induced and continues to induce users of the accused products to use the accused products in their ordinary and customary way to infringe the '790 patent, knowing that such use constitutes infringement of the '790 patent.

214.    The '790 patent is well-known within the industry as demonstrated by multiple citations to the '790 patent in published patents and patent applications assigned to technology companies and academic institutions.  Check Point is utilizing the technology claimed in the '790 patent without paying a reasonable royalty.  Check Point is infringing the '790 patent in a manner

---

23*See, e.g.*, *Check Point R80.10 Next Generation Threat Prevention Platforms: Security Gateway Architecture of the Future,* CHECK POINT WHITE PAPER (2017); *Check Point Application Control Self Help Guide,* CHECK POINT DOCUMENTATION (September 12, 2019); *Check Point Application Control Signature Tool,* CHECK POINT ADMINISTRATION GUIDE (November 1, 2017); *Check Point Tutorial: Configuring Application Control,* Check Point YouTube Channel (November 20, 2016), *available at*: https://www.youtube.com/watch?v=Sl3XohItwN8; *ATRG: Application Control Solution ID: sk73220,* CHECK POINT SUPPORT CENTER ARTICLE (January 2, 2021); *Check Point R80.10 Release Notes,* CHECK POINT DOCUMENTATION (July 27, 2019); *Check Point Next Generation Security Gateway R80.10 GUIDE,* CHECK POINT DOCUMENTATION (May 16, 2017); Pater Elmer, *Securing Office 365 Using NGTP To Protect Access To Office 365 Services,* CHECK POINT PRESENTATION (November 2016); *Check Point Best Practice – Application Control Solution ID: sk112249,* CHECK POINT SUPPORT CENTER (November 11, 2020); *Check Point Security Management R10.10 (Part of Check Point Infinity) Administration Guide,* CHECK POINT DOCUMENTATION (February 11, 2021); *Check Point R80.10 Unified Access Control Policy*, CHECK POINT YOUTUBE SUPPORT CHANNEL (June 5, 2017), *available at*: https://www.youtube.com/watch?v=AN1N8cwkjJk; and *Exceptions For Applications - Customizing The Application Signature Matching Process Solution ID: sk116601,* CHECK POINT SUPPORT CENTER (May 1, 2017).

best described as willful, wanton, malicious, in bad faith, deliberate, consciously wrongful, flagrant, or characteristic of a pirate.

215.    To the extent applicable, the requirements of 35 U.S.C. § 287(a) have been met with respect to the '790 patent.

216.    As a result of Check Point's infringement of the '790 patent, Plaintiffs have suffered monetary damages, and seek recovery in an amount adequate to compensate for Check Point's infringement, but in no event less than a reasonable royalty for the use made of the invention by Check Point together with interest and costs as fixed by the Court.

### COUNT VI
### INFRINGEMENT OF U.S. PATENT NO. 9,774,501

217.    Plaintiffs reference and incorporate by reference the preceding paragraphs of this Complaint as if fully set forth herein.

218.    Check Point designs, makes, uses, sells, and/or offers for sale in the United States products and/or services for detecting outlier users of a network resource.

219.    Check Point designs, makes, sells, offers to sell, imports, and/or uses Check Point Security Gateway devices with the Gaia OS R80.20 and later (including the following models: 2200, 3000, 3600, 3800, 4000, 5000, 5900, 6200, 6400, 6500, 6600, 6700, 6800, 6900, 7000, 12000, 12200, 12400, 12600, 13000, 15000, 16000, 16000T, 16200, 16600 HS, 21000, 23000, 26000, 26000T, 28000, and 28600 HS) (collectively, the "Check Point '501 Products").

220.    The Check Point '501 Products perform the method of monitoring stream data associated with a user or device's usage of a network resource for a predetermined time.

221.    The Check Point '501 Products perform the step of deriving a flow-count history. The flow-count history is generated based on stream data where a flow is a connection between a

source IP address and a transport layer port to a destination IP address and transport layer port in which all of the packets use the same protocol.

222.   The Check Point '501 Products perform the step of applying an outlier detection algorithm to the generated flow-count history associated with a user or a device and comparing the flow-count history to flow-count histories associated with other users or devices on the network.

223.   The Check Point '501 Products assign a flow-count band to the user based on the outlier detection algorithm and flow-count history.

224.   One or more of the Check Point '501 Products include technology for tracking flow data of a user subscriber for a predetermined time interval.

225.   One or more of the Check Point '501 Products include functionality for aggregating flow data of a user for a number of time periods.  The flow data that is aggregated by the Check Point '501 Products includes network communications between a particular source IP address and transport layer port to a particular destination IP address and transport layer port in which all of the packets are using the same protocol.

226.   One or more of the Check Point '501 Products generate a flow-count pattern where the flow-count pattern is the count of the number of flows the user initiates as either the source IP address or destination IP address during a predetermined time period.

227.   One or more of the Check Point '501 Products apply an outlier detection logic (algorithm) to the flow-count pattern as compared to a plurality of other flow-count patterns associated with a plurality of other users.

228.   One or more of the Check Point '501 Products apply a mitigating action to the user concerning the user's access to the network resource based on the flow-count band assigned.

229.    The Check Point '501 Products are available to businesses and individuals throughout the United States.

230.    The Check Point '501 Products are provided to businesses and individuals located in the State of Delaware.

231.    Check Point has directly infringed and continues to directly infringe the '501 patent by, among other things, making, using, offering for sale, and/or selling technology for managing data traffic comprising a plurality of micro-flows through a network, including but not limited to the Check Point '501 Products.

232.    By making, using, testing, offering for sale, and/or selling products and services for detecting outlier users of a network resource, including but not limited to the Check Point '501 Products, Check Point has injured Plaintiffs and is liable to Plaintiffs for directly infringing one or more claims of the '501 patent, including at least claim 1 pursuant to 35 U.S.C. § 271(a).

233.    Check Point indirectly infringes the '501 patent, including at least claim 1, by actively inducing infringement under 35 U.S.C. § 271(b).

234.    On information and belief, Check Point has had knowledge of the '501 patent since at least December 10, 2020, or shortly thereafter.  On December 10, 2020, Plaintiffs filed suit against Fortinet, Inc. and Masergy Communications, Inc. in the United States District Court for the Eastern District of Texas asserting, among other claims, infringement of the '501 patent.

235.    On information and belief, Fortinet, Inc. and Check Point are competitors.  On information and belief, Check Point monitors patent infringement lawsuits involving the assertion of pioneering patents in the field of computer networking against Check Point's competitors, including Plaintiffs' assertion of the '501 patent against Fortinet, Inc.  Accordingly, on or shortly after December 10, 2020, on information and belief, Check Point reviewed the '501 patent and the

allegations that Fortinet, Inc. infringed the '501 patent and learned that the Check Point '501 Products also infringed the '501 patent.

236.    Alternatively, Check Point has had knowledge of the '501 patent since at least service of this Complaint or shortly thereafter, and Check Point knew of the '501 patent and knew of its infringement, including by way of this lawsuit.

237.    Check Point intended to induce patent infringement by third-party customers and users of the Check Point '501 Products and had knowledge that the inducing acts would cause infringement or was willfully blind to the possibility that its inducing acts would cause infringement. Check Point specifically intended and was aware that the normal and customary use of the accused products would infringe the '501 patent. Check Point performed the acts that constitute induced infringement, and would induce actual infringement, with knowledge of the '501 patent and with the knowledge that the induced acts would constitute infringement. For example, Check Point provides the Check Point '501 Products that have the capability of operating in a manner that infringe one or more of the claims of the '501 patent, including at least claim 1, and Check Point further provides documentation and training materials that cause customers and end users of the Check Point '501 Products to utilize the products in a manner that directly infringe one or more claims of the '501 patent.[24] By providing instruction and training to customers and

---

[24] *See, e.g.*, Anat Eytan Davidi, *Security Management R80.40 – What's New*, CHECK POINT VIDEO CHANNEL (March 4, 2020), *available at*: https://www.facebook.com/checkpointsoftware/videos/whats-new-with-r8040-management/339366436970640/; *Logging and Monitoring R80.20 Administrative Guide,* CHECK POINT DOCUMENTATION (February 9, 2021); Sung Yang, *Next Generation Policy Management R80.10 Training Technologies Training Material,* CHECK POINT PRESENTATION (2018); *Absolute Beginner's Guide to R80.x,* CHECK POINT DOCUMENTATION (2019); *Logging and Monitoring R81 Administration Guide*, CHECK POINT DOCUMENTATION (February 7, 2021); *Best Practices for Remote Access in Disaster Mitigation and Recovery Scenarios,* CHECK POINT DOCUMENTATION (2020); *Scalable Platforms Performance Tuning R80.20SP Administration Guide,* CHECK POINT DOCUMENTATION (October 28, 2019); *ATRG: Compliance Blade (R80.10 and higher)*, CHECK POINT USER DOCUMENTATION (January 7, 2021); and *Logging and*

end-users on how to use the Check Point '501 Products in a manner that directly infringes one or more claims of the '501 patent, including at least claim 1, Check Point specifically intended to induce infringement of the '501 patent.  Check Point engaged in such inducement to promote the sales of the Check Point '501 Products, e.g., through Check Point user manuals, product support, marketing materials, and training materials to actively induce the users of the accused products to infringe the '501 patent.  Accordingly, Check Point has induced and continues to induce users of the accused products to use the accused products in their ordinary and customary way to infringe the '501 patent, knowing that such use constitutes infringement of the '501 patent.

238.    The '501 patent is well-known within the industry as demonstrated by multiple citations to the '501 patent in published patents and patent applications assigned to technology companies and academic institutions.  Check Point is utilizing the technology claimed in the '501 patent without paying a reasonable royalty.  Check Point is infringing the '501 patent in a manner best described as willful, wanton, malicious, in bad faith, deliberate, consciously wrongful, flagrant, or characteristic of a pirate.

239.    To the extent applicable, the requirements of 35 U.S.C. § 287(a) have been met with respect to the '501 patent.

240.    As a result of Check Point's infringement of the '501 patent, Plaintiffs have suffered monetary damages, and seek recovery in an amount adequate to compensate for Check Point's infringement, but in no event less than a reasonable royalty for the use made of the invention by Defendants together with interest and costs as fixed by the Court.

---

*Monitoring R80.20.M2 Management Feature Release Administration Guide,* CHECK POINT DOCUMENTATION (December 2, 2018).

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Sable IP, LLC and Sable Networks, Inc. respectfully request that this Court enter:

A.   A judgment in favor of Plaintiffs that Check Point has infringed, either literally and/or under the doctrine of equivalents, the '431, '932, '775, '593, '790, and '501 patents;

B.   An award of damages resulting from Check Point's acts of infringement in accordance with 35 U.S.C. § 284;

C.   A judgment and order finding that Check Point's infringement was willful, wanton, malicious, bad-faith, deliberate, consciously wrongful, flagrant, or characteristic of a pirate within the meaning of 35 U.S.C. § 284 and awarding to Plaintiffs enhanced damages.

D.   A judgment and order finding that this is an exceptional case within the meaning of 35 U.S.C. § 285 and awarding to Plaintiffs their reasonable attorneys' fees against Check Point.

E.   Any and all other relief to which Plaintiffs may show themselves to be entitled.

### JURY TRIAL DEMANDED

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs Sable IP, LLC and Sable Networks, Inc. request a trial by jury of any issues so triable by right.

February 12, 2021

BAYARD, P.A.

OF COUNSEL:

*/s/ Stephen B. Brauerman*
Stephen B. Brauerman (#4952)
Ronald P. Golden III (#6254)
600 N. King Street, Suite 400
P.O. Box 25130
Wilmington, Delaware 19801
(302) 655-5000
sbrauerman@bayardlaw.com
rgolden@bayardlaw.com

Dorian S. Berger
Daniel P. Hipskind
BERGER & HIPSKIND LLP
9538 Brighton Way, Ste. 320
Beverly Hills, CA 90210
(323) 886-3430
dsb@bergerhipskind.com
dph@bergerhipskind.com

*Attorneys for Plaintiffs Sable*
*Networks, Inc. and Sable IP, LLC*